**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| Sarah J. Beck, | ) | |
| PLAINTIFF | ) | |
| v. | ) | Civil Action No. 1:18-CV-00174-JRS-DLP |
| | ) | |
| Honda Manufacturing Of | ) | |
| Indiana, LLC | ) | |
| DEFENDANT | ) | |

**PLAINTIFF'S RESPONSE/OPPOSITION TO DEFENDANT'S
MOTION/MEMORANDUM FOR SUMMARY JUDGMENT**

Comes now Plaintiff, by counsel, and responds to Defendant's Motion for

Summary Judgment [ECF#75], Brief in Support of Motion for Summary Judgment

[ECF#78], and Designation of Evidence in Support of It Motion for Summary

Judgment [ECF#76].

## I.      Background

Ms. Beck resides in Jennings County, Indiana. (Beck Dep. Tr. 10:1-2, ECF

No. 91-1 at 12169) Ms. Beck graduated from Jennings County High School in

1975. She does not have any additional education or certifications beyond high

school. She does have a valid driver's license. (Beck Dep. Tr. 15:2-15, ECF No. 76-1

at 302) Ms. Beck's date of birth is March 21, 1957. She planned to retire from

Honda at full retirement age, 67. (Beck Dep. Tr. 210:18-25, ECF No. 91-1 at

12213)

Ms. Beck learned about employment positions at Honda through the

Republic Newspaper. (Beck Dep. Tr. 37:1-10, ECF No. 91-1 at 12186) She applied

for employment at Honda in 2007. There was no specific position for which she

applied. (Beck Dep. Tr. 37:23-25, ECF No. 91-1 at 12186) Ms. Beck received an

automated phone call from Honda in 2008. (Beck Dep. Tr. 38:21-23, ECF No. 91-1 at 12187) She received another call from Honda 5 or 6 months later providing a date for her to come in for testing. (Beck Dep. Tr. 39:17-25, ECF No. 91-1 at 12188) She was contacted by Honda in February or March 2010 to go to the Honda facility for more testing. (Beck Dep. Tr. 44:4-12, ECF No. 76-1 at 312)

## II.    Statement of Material Facts in Dispute

Ms. Beck started April 5, 2010 as a production associate in body assembly. (Beck Dep. Tr. 46:2-11, ECF No. 76-1 at 314) She remained employed with Honda until May 19, 2016. (ECF No. 91-10 at 12630, ¶29) While employed at Honda, she had good attendance. (ECF No. 91-10 at 12627, ¶7) There were other areas in the plant such as vehicle quality and a testing facility. (Beck Dep. Tr. 47:1-7, ECF No. 76-1 at 315) Ms. Beck recalled one week of training, involving tours of the plant, and reviews of op standards.[1]  (Beck Dep. Tr. 52:11-15, ECF No. 76-1 at 320) Ms. Beck was assigned to Wire and Tubing 1. (Beck Dep. Tr. 53:1-2, ECF No. 76-1 at 321) Ms. Beck's associate number was 29973. (Beck Dep. Tr. 55:6-8, ECF No. 76-1 at 323) The number was used for seniority reflecting her hiring date. (Beck Dep. Tr. 55:12-16, ECF No. 76-1 at 323) The Honda employee numbers commenced at 280 and kept going. (Beck Dep. Tr. 55:17-20, ECF No. 76-1 at 323)

Ms. Beck testified op standards are job descriptions for production associates. (Beck Dep. Tr. 66:1-18, ECF No. 76-1 at 334) Ms. Beck did not know of any physical requirements for her to be able to do her job. (Beck Dep. Tr. 66:13-22, ECF No. 76-1 at 334) She does not recall any physical requirements for bending,

---

[1] Operation standards.

stooping or squatting to be able to do her job. (Beck Dep. Tr. 67:1-4, ECF No. 76-1 at 335) Ms. Beck was never provided or told about a document labeled "Process/Equipment Services Associate"[2] when she was hired or during the time period she was employed with Honda. (ECF No. 91-10 at 12630, ¶30) The same is true for former Honda employees, Bridget Thomas (ECF No. 91- 11 at 12638, ¶42-43) and Rhonda Cook (ECF No. 91-12 at 12642, ¶12-13). Charla Brown, Human Resources for Honda, was not familiar with documents that would be provided to new hired associates at Honda. (Tate-Brown Dep. Tr. 180:5-13, ECF No. 91-2 at 12306) While at Honda, Ms. Beck drove no forklifts. (Beck Dep. Tr. 96:5-15, ECF No. 91-1 at 12195)

Operation standards at Honda are important daily job tasks for job functions to be performed by production associates. (ECF No. 91-10 at 12631, ¶35) Associates are required to read, write out step by step and sign off on operation standards maintaining they know how to do jobs. (ECF No. 91-10 at 12631, ¶34-36; ECF No. 91-11 at 12638-12639, ¶46-47; ECF No. 92-12 at 12642-12643, ¶16-18) Operation standards at Honda "…outline the work that must be completed." (Nichols Dep. Tr. 17:12-25, ECF No. 91-6 at 12453, Nichols Dep. Tr. 18:1-5, ECF No. 91-6 at 12454) A task within an operation standard is referred to as a unit of operation. (Nichols Dep. Tr. 18:10-14, ECF No. 91-6 at 12454) If it is written in operation standards, Honda would consider it to be essential. (Nichols Dep. Tr. 18:24-25, ECF No. 91-6 at 12454; Nichols Dep. Tr. 19:1-7, ECF No. 91-6 at 12455)

---

[2] Exhibit 2 to Brown's Declaration (ECF 76-4)

Operation standards at Honda do not maintain only left or right-handed persons perform the standards. (Nichols Dep. Tr. 32:3-8, ECF No, 91-6 at 12468) Honda does not exclude persons who primarily use left or right arm for operation standards in doorline. (Nichols Dep. Tr. 34:9-17, ECF No. 91-6 at 12470) Ms. Beck has reviewed operation standards produced in discovery by Honda regarding quality gates, doorline and vehicle quality. She is qualified to do the important job tasks of said operation standards. (ECF No. 91-10 at 12632, ¶42-44) Ms. Beck also did four-process rotations in the areas where Honda placed her from February 2014 to May 2016. (ECF No. 91-10 at 12631, ¶41) At the time Ms. Brown told her not to return to Honda in May 2016, Ms. Beck was performing four-person rotation of visual inspections. (ECF No. 91-10 at 12629, ¶21) Ms. Cook has testified there were job positions that Ms. Beck could have performed on doorline, assembly frame, quality gates, or vehicle quality. (ECF No. 91-12 at 12640-12643, ¶1-26)

Angela Topper has been employed with Honda since January 2009. She currently has the position of corporate manpower controller. (Topper Dep. Tr. 4:23-25, ECF No. 91-8 at 12531; Topper Dep. Tr. 5:1-18, ECF No. 91-8 at 12532) On Exhibit 4, Bate 13797 (ECF No, 99-1 at 23344), the far hand left column has a number of 6,110. This represents 6,110 temporary[3] associates terminated from January 2011 to the present. (Topper Dep. Tr. 117:14-25, ECF No. 91-9 at 12620; Topper Dep. Tr. 118:1-3, ECF No. 91-9 at 12621) As will be illustrated in this response, positions were available within doorline, vehicle quality, and quality gates during July 2013 through November 2017 for which Ms. Beck should have

---

[3] As will be illustrated below, temporary associates are from outside services such as Kelly and Elwood. Their employee numbers begin with "B."

been accommodated, as she was qualified to do said jobs and rotations.

In June 2013, Ms. Beck injured her right shoulder when she picked up a bundle of brake lines to put them on a rack. (Beck Dep. Tr. 78:3-8, ECF No. 76-1 at 339) The following day, after obtaining an MRI and visiting with the doctor, she reported to work at Honda. (Beck Dep. Tr. 83:8-13, ECF No. 76-1 at 344) Ms. Beck had restrictions of left-handed work. (Beck Dep. Tr. 83:19-23, ECF No. 76-1 at 344) Ms. Beck had torn her bicep tendon as well as had a rotator cuff tear, which required surgery. (Beck Dep. Tr. 85:14-20, ECF No. 76-1 at 346) In September 2013, Ms. Beck had surgery performed by Dr. Salley for rotator cuff only. (Beck Dep. Tr. 87:10-25, ECF No. 76-1 at 348) Ms. Beck was off for approximately seven weeks for surgery. (Beck Dep. Tr. 92:21-23, ECF No. 76-1 at 353) Ms. Beck did not take any time off from work prior to her surgery date. (Beck Dep. Tr. 92:24-25, ECF No. 76-1 at 353, Beck Dep. Tr. 93:1, ECF No. 76-1 at 354) Ms. Beck continued to work at Honda left-handed. (Beck Dep. Tr. 92:5-6, ECF No. 76-1 at 353) Ms. Beck returned to work in October 2013 after surgery. She continued to work according to her restrictions. (Beck Dep. Tr. 95:8-13, ECF No. 76-1 at 356)

In February 2014, Dr. Salley opined permanent restrictions regarding Ms. Beck's right shoulder stating no commercial driving, no lifting one pound frequently from floor to waist, and no work above chest level. (Beck Dep. Tr. 100:24-25, ECF No. 76-1 at 360, Beck Dep. Tr. 101:1-3, 9-13, ECF No. 76-1 at 361) Ms. Beck continued working on quality gates, set up throughout the plant. (Beck Dep. Tr. 102:21-25, ECF No. 76-1 at 362, Beck Dep. Tr.103:1-4, ECF No. 76-1 at 363) Brandon Parker approved decisions to place Ms. Beck in quality gates.

(Beck Dep. Tr.103:13-15, ECF No. 76-1 at 363) Ms. Beck worked on doorline performing checks, final assembly line, looking for flaws in different items. Wherever there was a problem there was a quality gate set up. (Beck Dep. Tr. 104:5-19, ECF No. 76-1 at 364) Ms. Beck testified quality gates would exist to contain a problem. (Beck Dep. Tr. 107:16, EFC No. 91-1 at 12197) There was always a problem requiring quality gates. (Beck Dep. Tr. 105:22-24, ECF No. 76-1 at 365, Beck Dep. Tr. 110:6-9, ECF No. 76-1 at 368 )

From October 2014 until May 2016, Ms. Beck worked regular and overtime hours approved by Brandon Parker. (ECF No. 91-10 at 12629, ¶18-19) Ms. Beck continued to work at Honda until she received a voicemail message on her phone from Ms. Brown in May 2016 advising her not to return. (Beck Dep. Tr. 122:23-25, ECF No. 76-1 at 380, Beck Dep. Tr. 123:1-10, ECF No. 76-1 at 381) Ms. Beck and Ms. Brown had a meeting two weeks prior to the voicemail message. (Beck Dep. Tr.124:19-24, ECF No. 76-1 at 382)

In May 2016, Ms. Beck comes to the attention of Ms. Brown although she (Ms. Brown) does not know how. (Brown-Tate Dep. Tr. 94:23-25, ECF No. 76-2 at 552, Brown-Tate Dep. Tr. 95:1-3, ECF No. 76-2 at 553) She does not know of any reason why Ms. Beck's restrictions did not come to her attention earlier than May 2016. (Brown-Tate Dep. Tr. 94:7-17, ECF No. 76-2 at 552) In May 2016, Ms. Beck was full time employed with Honda. (Brown-Tate Dep. Tr. 86:2-6, ECF No. 76-2 at 544) Yet, at the same time, Ms. Brown told Ms. Beck to file for long term disability. (Brown-Tate Dep. Tr. 85:12-14, ECF No. 76-2 at 543)

Ms. Brown stated Ms. Beck should file for unemployment, and after five

months, file for long term disability. (Beck Dep. Tr. 125:3-11, ECF No. 76-1 at 383) When Ms. Brown met with Ms. Beck in May 2016, Ms. Beck maintained she was able to perform work at Honda. As Ms. Brown testified "She has always indicated she is able to do work at Honda." (Brown-Tate Dep. Tr. 97:16-21, ECF No. 76-2 at 555)

Ms. Beck asked Ms. Brown why she could not be sent to VQ (vehicle quality). Ms. Brown stated she had a "no commercial driving restriction" so she could not be placed there. (Beck Dep. Tr. 125:13-15, ECF No. 76-1 at 383) Vehicle quality does not require a driver's license or a commercial driver's license. (Arthur Dep. Tr. 13:1-7, ECF No. 91-5 at 12421) Ms. Brown does not recall whether Ms. Beck told her she was able to lift the hood of a car with her left arm for work in vehicle quality. Ms. Brown does not remember specifically asking her that question. (Brown-Tate Dep. Tr. 98:10-19, ECF No. 76-2 at 556) At Honda, it does not matter what department an associate with restrictions is placed as long as a job is available that could match up with an associate's restriction. (Brown-Tate Dep. Tr. 99:1-10, ECF No. 76-2 at 557)

Ms. Beck communicated to Ms. Brown during the meeting she was capable of doing jobs in doorline, quality gates, and vehicle quality as examples. (Beck Dep. Tr. 126:2-8, ECF No. 91-1 at 12198) Ms. Brown stated one person had come back to work with the restrictions lifted. (Beck Dep. Tr. 126:12-16, ECF No. 91-1 at 12198) Bridget Thomas was told by Ms. Brown to have her restrictions lifted so she could return to work at Honda. (ECF No. 91-11 at 12637, ¶24-29)

In May 2016, Ms. Brown stated to Ms. Beck not to return to work unless Ms.

Brown communicated with her that she had found her a job. (Beck Dep. Tr. 147:4-12, ECF No. 76-1 at 401) Ms. Brown agreed with this statement. (Conversation Tr. 4:17-21, ECF No. 91-13 at 12646) Ms. Beck did not understand Ms. Brown's comment, as Ms. Beck had a job one day, the next day did not have a job, yet the job still existed. (Beck Dep. Tr. 148:4-12, ECF No. 76-1 at 402) Ms. Beck has knowledge another person was placed in her job the next day after she was sent home. (Beck Dep. Tr.149:4-22, ECF No. 76-1 at 403) When Ms. Beck was dismissed in May 2016, she was performing visual inspections on quality gate, in Albert Taylor's area of body assembly. (Beck Dep. Tr. 150:11-20, ECF No. 91-1 at 12202; ECF No. 91-10 at 12629 ,¶21) Ms. Brown became in charge of disability management in approximately 2015. (Brown-Tate Dep. Tr. 27:4-8, ECF No. 76-2 at 529) The disability management group would be responsible for restriction management if an associate has restrictions. (Brown-Tate Dep. Tr. 27:22-25, ECF No. 76-2 at 529, Brown-Tate Dep. Tr. 28:1-4, ECF No. 76-2 at 530) In 2015, disability management group was placed under plant safety. (Brown-Tate Dep. Tr. 30:16-23, ECF No. 76-2 at 532) During the time period of 2014 to 2017, Ms. Brown was part of plant safety group. (Brown-Tate Dep. Tr .29:16-20, ECF No. 76-2 at 531; Parker Dep. Tr. 33:25, ECF No. 76-3 at 617; Parker Dep. Tr. 34:1-5, ECF No. 76-3, at 618)

Ms. Brown testified there would have been a listing of job functions for vehicle quality which would be considered essential job functions. However, she did not review those with Ms. Beck as it was not part of her process to do so. (Brown-Tate Dep. Tr. 113:22-25, ECF No. 91-2 at 12261; Brown-Tate Dep. Tr.

114:1-4, ECF No. 91-2 at 12262) Ms. Brown did not have a list of essential job functions relative to vehicle quality when she sat down with Ms. Beck to determine if Ms. Beck could do a job with her restrictions. (Brown-Tate Dep. Tr.115:24-25, ECF No. 91-2 at 12263; Brown-Tate Dep. Tr. 116:1-6, ECF No. 91-2 at 12264) In fact, Ms. Brown did not reach out to safety personnel in various departments requesting a listing of essential job functions, so she could go over those functions with associates who had restrictions. (Brown-Tate Dep. Tr. 116:12-19, ECF No. 91-2 at 12264)

Ms. Brown's process of sending emails to department heads, not looking at operation standards within Honda to determine if an employee with restrictions can be placed within a process rotation is her own process, not one taught by Honda, but Honda knew of her process. (Brown-Tate Dep. Tr. 125:2-25, ECF No. 76-2 at 571; Brown-Tate Dep. Tr. 126:1-25, ECF No. 76-2 at 572; Brown-Tate Dep. Tr. 127:1-2, ECF No. 76-2 at 573) Ms. Brown has followed this process since 2014. (Brown-Tate Dep. Tr. 125:14-16, ECF No. 76-2 at 571)

Ms. Brown did not review information from PeopleSoft to determine if Ms. Beck could be reasonably accommodated within the Honda plant as of May 2016. (Brown-Tate Dep. Tr. 136:25, ECF No. 91-2 at 12276; Brown-Tate Dep. Tr. 137:1-4, ECF No. 91-2 at 12277) PeopleSoft is a personnel management program used at the Greensburg plant since it has opened. (Topper Dep. Tr. 94:22-25, ECF No. 91-9 at 12597) It keeps track of personnel hired, fired, associates moving from one position to another, temporary associates and associates that move from one team to another. (Topper Dep. Tr. 95:2-21, ECF No. 91-9 at 12598)

Some of the quality gates had two or four person rotations. Ms. Beck maintained quality gates were everywhere, all over the plant. (Beck Dep. Tr. 128:18-22, ECF No. 91-1 at 12200) Ms. Beck was on a four-person rotation with quality gate. (Beck Dep. Tr. 129:6-8, ECF No. 91-1 at 12201) Ms. Beck was working for Albert Taylor and/or quality group at the time of her dismissal in May 2016. (ECF No. 91-10 at 12629, ¶21) Ms. Beck testified from her experience the difference between temporary and permanent quality gates is that permanent quality gates stay in one specific area, temporary quality gates move from area to area. (Beck Dep. Tr. 212:20-25, ECF No. 91-1 at 12215; Beck Dep. Tr. 213:1-5, ECF No. 91-1 at 12216)

Ms. Beck did not file for unemployment. (Beck Dep. Tr. 131:13-14, ECF No. 76-1 at 381) After the May 2016 meeting, Cigna Long Term Disability contacted Ms. Beck. (Beck Dep. Tr. 135:4-10, ECF No. 76-1 at 389) Ms. Beck made it quite clear she wanted her job, not disability and should be working. (Beck Dep. Tr. 135:15-21, ECF No. 76-1 at 389) Ms. Beck received long term disability checks, all were returned with the exception of one. (Beck Dep. Tr.136:15-25, ECF No. 76-1 at 390; Beck Dep. Tr.137:1-8, ECF No. 76-1 at 391) The one check was mistakenly deposited by her partner. (Beck Dep. Tr. 137:1-8, ECF No. 76-1 at 391) The total amount returned was $10,135. (ECF No. 91-10 at 12630, ¶25)

In late 2016, Ms. Beck received a voicemail from Ms. Brown inquiring if Ms. Beck had signed up for long term disability. (Beck Dep. Tr.156:8-11, ECF No. 76-1 at 407) Ms. Beck did not contact Ms. Brown because Ms. Beck was not interested in long term disability. (Beck Dep. Tr. 156:18-22, ECF No. 76-1 at 407) On August

1, 2017, Ms. Beck signed a letter to Honda in response to Ms. Brown's letter of July 25, 2017. (Beck Dep. Tr. 159:21-24, ECF No. 76-1 at 410; ECF No. 76-1 at 521)

Following Ms. Beck's letter, a conversation occurred between Ms. Beck and Ms. Brown on August 7, 2017. (ECF No. 91-10 at 12629-12630, ¶22-27; ECF No. 91-13 at 12644-12655) Ms. Brown reviewed positions of HR person, quality engineer, safety engineer. (Beck Dep. Tr. 162:24-25, ECF No. 76-1 at 413; Beck Dep. Tr. 163:1-3, ECF No. 76-1 at 141; Conversation Tr. 5:8-24, ECF No. 91-13 at 12647; Conversation Tr. 6:21-24, ECF No. 91-13 at 12647) Ms. Brown was requesting Ms. Beck apply for skilled jobs. (Beck Dep. Tr. 165:9-16, ECF No. 76-1 at 416; Conversation Tr. 6:1-25, ECF No. 91-13 at 12647; Conversation Tr. 7:1-25, ECF No. 91-13 at 12647) Ms. Beck stated to Ms. Brown she was interested in any job in her pay scale and category that met her restrictions. (Conversation Tr. 9:14-15, ECF No. 91-13 at 12648) Ms. Beck asked why she could not be placed in quality gates, or any other job openings that met her restrictions, Ms. Brown responded "okay, well, I think at this point those are all my questions." (Conversation Tr. 11:14-21, ECF No. 91-13 at 12648)

Ms. Beck was contacted by Mr. Evans of Honda in September 2017. (Beck Dep. Tr. 166:23-25, ECF No. 76-1 at 417) Ms. Beck asked why she was not working when there were jobs she could do. Mr. Evans responded he would get back with Ms. Beck. (Beck Dep. Tr. 167: 5-16, ECF No. 76-1 at 418) Mr. Evans contacted Ms. Beck by letter and stated she was terminated. (Beck Dep. Tr. 168:23-25, ECF No. 76-1 at 419; Beck Dep. Tr.169:1, ECF No. 76-1 at 420)

Ms. Beck had not applied for any open positions at Honda, as referenced in

Mr. Evans' letter September 29, 2107 because positions were all skilled positions for which she was not qualified. (Beck Dep. Tr. 133:9-20, ECF No. 76-1 at 387; Beck Dep. Tr. 134:1-2, ECF No. 76-1 at 388; Conversation Tr. 5:7-25, ECF No. 91-13 at 12647, Conversation Tr. 6:1-25, ECF No. 91-13 at 12647; Conversation Tr. 7:1-25, ECF No. 91-13 at 1, Conversation Tr. 8:1-9, ECF No. 91-13 at 1) Between May 19, 2016 until September 29, 2017, Ms. Brown did not recall if she ever inquired of any departments as to whether there were any process rotations available that could accommodate Ms. Beck's restrictions. (Tate-Brown Dep. Tr. 142:16-20, ECF No. 91-2 at 12282)

Brittany Parrish was hired by Honda in 2007. (Parrish Dep. Tr. 5:19-22, ECF No. 91-3 at 12321) In 2015, Ms. Parrish was considered a Shift Responsible Associate in which she would manage an entire department from a production standpoint. (Parrish Dep. Tr. 8:7-12, ECF No. 91-3 at 12324) In May 2016, Ms. Parrish became a delivery lead managing process and equipment engineers on the entire assembly line. (Parrish Dep. Tr. 10:22-25, ECF No. 76-6 at 649; Parrish Dep. Tr. 11:1-10, ECF No. 76-6 at 650) Prior to May 2016, Ms. Parrish had a desk on the assembly line. (Parrish Dep. Tr. 11:21-25, ECF No. 76-6 at 650) When she was an SRA, she would have a desk at the end of the line on the production floor. (Parrish Dep. Tr. 12:6-9, ECF No. 76-6 at 651) The assembly line encompasses approximately half the plant. (Parrish Dep. Tr. 12:10-13, ECF No. 76-6 at 651) There were six permanent quality gates from 2010 through May 2016 in assembly line. (Parrish Dep. Tr. 12:22-25, ECF No. 76-6 at 651; Parrish Dep. Tr. 13:1, ECF No. 76-6 at 652; Parrish Dep. Tr. 19:15-17, ECF No. 91-3 at 12325) Anywhere from

3-6 associates would work on each quality gate. (Parrish Dep. Tr. 14:1-8, ECF No. 76-6 at 653) There were also temporary quality gates associated with assembly line when there is a quality outflow issue. (Parrish Dep. Tr. 14:2-19, ECF No. 76-6 at 653) Exhibit 1 to Ms. Parrish's deposition is an email by Ms. Parrish dated May 11, 2016. (Parrish Dep. Tr. 26:13-24, ECF No. 76-6 at 663) Ms. Parrish stated in the email that Ms. Beck is "…top notch when it comes to building quality." (Parrish Dep. Tr. 28:2-5, ECF No. 76-6 at 665) Ms. Parrish was referring to a time in 2010, but Ms. Beck left such an impression upon her that six years later she sent the email. (Parrish Dep. Tr. 28:20-24, ECF No. 76-6 at 665; Parrish Dep. Tr. 29:4-7, ECF No. 76-6 at 666) By quality, meant that the function was built correctly to operation standards. She remembers having a conversation with Ms. Beck on May 11, 2016. (Parrish Dep. Tr. 29:15-20, ECF No. 76-6 at 666) At that time, Ms. Beck had been manning her own quality gate in assembly frame. (Parrish Dep. Tr. 30:5-11, ECF No. 76-6 at 667) Ms. Parrish's statement that Ms. Beck was "…too good to sit at home and do nothing" was true in May 2016, and she had no reason to feel differently at the time of her deposition. (Parrish Dep. Tr. 31:8-18, ECF No. 76-6 at 668) She is not aware of any associates within assembly frame who have permanent restrictions. (Parrish Dep. Tr. 32:19-22, ECF No. 76-6 at 669) Ms. Parrish was not contacted by any person in plant safety to determine if a job was available for Ms. Beck given her permanent restrictions around the time Ms. Parrish sent her email. (Parrish Dep. Tr. 33:11-16, ECF No. 76-6 at 670) She did receive a response from Ms. Mowery. Exhibit 2 (ECF No. 91-3 at 12334) to Ms. Parrish's deposition is an email from Ms. Mowery to Ms. Parrish regarding Ms.

Parrish's May 11, 2016 email. (Parrish Dep. Tr. 34:2-10, ECF No. 76-6 at 671) The term "perms" is short for permanent. (Parrish Dep. Tr. 35:2-4, ECF No. 76-6 at 672) Ms. Parrish believes in reviewing her email she thought Ms. Beck was top notch as an associate, was able to do work, despite Ms. Beck's restrictions. (Parrish Dep. Tr. 39:8-22, ECF No. 91-3 at 12329)

Since Ms. Beck's termination from Honda, Ms. Beck did not seek unemployment benefits as she thought Honda would call her back. (Beck Dep. Tr. 192:20-25, ECF No. 76-1 at 439; Beck Dep. Tr. 193:1, ECF No. 76-1 at 440)

Since her termination from Honda, Ms. Beck has not found any job that has benefits, pay, hours, seniority, vacation as she did with Honda. (Beck Dep. Tr. 186:7-11, ECF No. 76-1 at 433) She has looked for factory positions in Columbus, North Vernon, Cummins, Faurecia, and Lowe's Distribution. (Beck Dep. Tr. 186:12-18, ECF No. 76-1 at 433) Ms. Beck is currently employed as a server for Cracker Barrel located in Seymour. (ECF No. 91-10 at 12632, ¶48) Ms. Beck has been employed at Cracker Barrel since April 2019. (ECF No. 91-10 at 12632, ¶48) Ms. Beck also worked at Mark Pi's Restaurant in Columbus, Indiana beginning 2017. (Beck Dep. Tr. 18:8-10, ECF No. 76-1 at 305) She also worked at Mark Pi's from 1991 to 2000. (Beck Dep. Tr. 25:17-19, ECF No. 91-1 at 12174) In 2000, she left the Mark Pi's position, moved to North Vernon and obtained a job at Lowe's in North Vernon. (Beck Dep. Tr. 26:19-25, ECF No. 91-1 at 12175; Beck Dep. Tr. 27:1-5, ECF No. 91-1 at 12176) Ms. Beck worked at Lowe's from 2000 to 2002 in the building department. (Beck Dep. Tr. 27:13-19, ECF No. 91-1 at 12176) Ms. Beck also worked at Print Pack in Greensburg after Lowe's until she became

employed at Honda. (Beck Dep. Tr. 33:10-25, ECF No. 91-1 at 12182; Beck Dep. Tr. 34:1-17 ECF No. 91-1 at 12183)

There will be additional factual designations throughout the response to support various arguments in opposition to Defendant's positions.

### III.    Argument

A.    <u>Summary Judgment Standard</u>.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.,* 113 F.3d 750, 757 (7th Cir. 1997).

"When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party...In deciding a motion for summary judgment, the court is not authorized to choose between conflicting testimony or to resolve credibility issues." *Nicholas v. Acuity Lighting Group, Inc.*, 2005 WL 280341 (S.D. Ind.) *1.

B.    <u>Genuine issues of material fact exist regarding essential job functions at Honda</u>.

A disabled employee may establish a prima facie case under the Americans with Disability Act if she shows she can perform the essential function[s] of the job with reasonable accommodation and the employer refused to make such an

accommodation. Ms. Beck must establish she (1) has a disability,[4] (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability; (4) her work performance met the employer's legitimate job expectations.[5] *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995).

A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8), 29 C.F.R. §1630.2(m). The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. §1630.2(m).

Given Ms. Beck's experience at Honda, she definitely had the requisite skill, experience, education and other job-related requirements for quality gate, doorline, and vehicle quality. (ECF No. 91-10 at 12629, ¶21; ECF No. 91-10 at 12631-12632, ¶34-47) Further, Ms. Parrish testified Ms. Beck was "top notch." (Parrish Dep. Tr. 28:2-5, ECF No. 76-6 at 665)

Whether a particular function is essential is a factual determination be made on a case by case basis based upon all relevant evidence. *Nicholas, supra,* *12. An essential function is a fundamental job duty required of a person in the

---

[4] Defendant has conceded this point. (ECF No. 78 at 717) Defendant was also aware of Ms. Beck's disability well in advance of her adverse employment action. (ECF No. 76-4 at 633-634, ¶5)

[5] Defendant put forth no evidence that Ms. Beck was not performing as expected. To the contrary, Ms. Beck put forth evidence that she "top notch" and had no attendance issues.

job. A marginal duty is not an essential function. *Shell v. Smith*, 789 F.3d 715, 719 (7th Cir. 2015), 29 C.F.R. §1630.2(n)(1). Evidence of whether a particular function is essential might include, but is not limited to:

(i)     The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)   The consequences of not requiring the incumbent to perform the function;

(v)    The terms of a collective bargaining agreement;[6]

(vi)   The work experience of past incumbents in the job; and/or

(vii)  The current work experience of incumbents in similar jobs.

29 C.F.R. §1630.2(n)(3).

Evidence of whether a function is essential includes the consequences of not requiring the incumbent to perform the function. 29 C.F.R. §1630.2(n)(3)(iv).

The inquiry into whether a particular function is essential initially focuses on whether the employer actually imposes such requirements on employees in the position to perform the functions that the employer asserts are essential and not simply on paper. 29 C.F.R. §1630, App. Essential functions of the fundamental duties of a job (i.e. outcomes that must be achieved by someone in that position.).

Essential job functions at Defendant's facility are defined by "operation standards." There are thousands of operation standards Ms. Beck was qualified to do with or without accommodations within the areas of doorline, vehicle quality, and quality checks. (ECF No. 91-10 at 12632, ¶42-44) None of these operation standards require a person to use a left or right arm when performing

---

[6] Honda did not have a union. (ECF No. 91-10 at 12627, ¶8)

said standards. (ECF No. 91-10 at 12632, ¶45) By way of example, Bate 1836 (ECF No. 93-2 at 14422), and 2452 (ECF No. 93-5 at 14866) are demonstrated using the left arm. (ECF No. 91-10 at 12632, ¶45) Ms. Beck also performed jobs on a four-process rotation from February 2014 to May 2016. (ECF No. 91-10 at 12631, ¶41)

The Interpretive Guidance of 29 C.F.R. Pt. §1630 App. leaves room for a plaintiff to come forward with evidence contradicting the employer's claim as to whether a particular function is essential, based in part on the way the job is actually performed. *Nicholas*, *supra*, *12.

Jeff Nichols became employed with Honda in September 2008. (Nichols Dep. Tr. 5:19-24, ECF No. 91-6 at 12441) His current position is data team manager for Honda's process engineering group. (Nichols Dep. Tr. 6:3-8, ECF No. 91-6 at 12442) He reviewed operation standards regarding quality gate and doorline areas. (Nichols Dep. Tr. 8:13-16, ECF No. 91-6 at 12444) There are eight quality gates within assembly frame. (Nichols Dep. Tr. 14:13-17, ECF No. 91-6 at 12450) Within each quality gate, there are two to five associates working. (Nichols Dep. Tr. 14:18-20, ECF No. 91-6 at 12450) In developing the operation standards, consideration is given to how an associate is able to move relative to the operation standards. (Nichols Dep. Tr.19:18-22, ECF No. 91-6 at 12455) Within quality gates, at least within assembly frame, operation standards can involve touching of automobiles, entering computer data, steering wheel checks, sitting in a car seat, seat belt checks, looking for scratches and gaps. (Nichols Dep. Tr. 21:8-25, ECF No. 91-6 at 12457; Nichols Dep. Tr. 22:1-4, ECF No. 91-6 at 12458) Quality gate

positions within assembly frame is a four-process rotation. Four-process rotation means associates rotate within another quality gate assembly frame every two hours. (Nichols Dep. Tr. 22:17-23, ECF No. 91-6 at 12458) Exhibit 2 to Mr. Nichols' deposition includes Bate 1136-3672 (ECF No. 93-1, 93-2, 93-3, 93-4, 93-5, 93-6, 93-7, 93-8), which are operation standards regarding quality gate. (Nichols Dep. Tr. 23:8-16, ECF No. 91-6 at 12459; ECF No. 93-1 at 13951- 15601) Quality gate operation standards would be labeled QG. Doorline would be labeled DL. The quality gate standards he reviewed would have been in effect from April 2010 through September 2017. (Nichols Dep. Tr. 25:18-21, ECF No. 91-6 at 12461)

Bate 1204 to 1248 (ECF No. 93-1 at 14020-14064) are operation standards for quality gate 2. (Nichols Dep. Tr. 34:18-22; ECF No. 91-6 at 12470; Nichols Dep. Tr. 35:4-6, ECF No. 91-6 at 12471) Bate 1208 (ECF No. 93-1 at 14024) is to verify that the seat slide is functioning. Bate 1209 (ECF No. 9301 at 14025) is to determine if door handles are operating properly. (Nichols Dep. Tr. 36:8-20, ECF No. 91-6 at 12472) The operation standards require the work for the standard. As far as actual body movements, it is not necessarily stated in the standards. (Nichols Dep. Tr. 36:24-25, ECF No. 91-6 at 12472; Nichols Dep. Tr. 37:1-10, ECF No. 91-6 at 12473) Operation standards for doorline would have DL. (Nichols Dep. Tr. 37:11-15, ECF No. 91-6 at 12473)

Between 2008 and September 2017, there were between five and nine doorline teams. (Nichols Dep. Tr. 37:19-25, ECF No. 91-6 at 12473) 46 persons work on the doorline teams. The doorline zone would have teams DL01 and DL02. (Nichols Dep. Tr. 38:1-13, ECF No. 91-6 at 12474) Currently, there are nine teams.

(Nichols Dep. Tr. 38:12, ECF No. 91-6 at 12474)

Before 2016-2017, there were seven doorlines per shift. (Nichols Dep. Tr. 11:14-18, ECF No. 91-7 at 12495) There were 46 associates for each shift. (Nichols Dep. Tr. 11:19-21, ECF No. 91-7 at 12495) The doorline operation standards do not state body movements an associate must do to complete a task. (Nichols Dep. Tr. 12:2-5, ECF No. 91-7 at 12496) Operation standards do not state any type of physical qualification an associate must have in order to complete tasks on doorline. (Nichols Dep. Tr. 15:6-10, ECF No. 91-7 at 12499)

The words "control method" in operation standards is the method of controlling quality of the process. (Nichols Dep. Tr. 20:6-12, ECF No. 91-7 at 12504) Bate 9055 (ECF No. 95-7 at 18588), the control method is "visual/touch" meaning the associate touches or visually inspects this particular unit of operation. (Nichols Dep. Tr. 20:16-19, ECF No. 91-7 at 12504) Each of the door standards has a control method for which an associate is to complete the unit of operation. (Nichols Dep. Tr. 22:9-13, ECF No. 91-7 at 12506)

Thomas Arthur is a team manager within vehicle quality. He became employed with Honda in October 2010. (Arthur Dep. Tr. 5, 4:16-25, ECF No. 91-5 at 12412) He has remained within the department of vehicle quality since he began at Honda. (Arthur Dep. Tr. 5:19-20, ECF No. 91-5 at 12413) There are different teams within vehicle quality. (Arthur Dep. Tr. 6:15-25, ECF No. 91-5 at 12414; Arthur Dep. Tr. 7:1-25, ECF No. 91-5 at 12415; Arthur Dep. Tr. 8:1-18, ECF No. 91-5 at 12416) There are 45 associates per shift for vehicle quality. There are two shifts that occur. (Arthur Dep. Tr. 9:16-20, ECF No. 91-5 at 12417) Not all of

vehicle quality is a four-rotation process. (Arthur Dep. Tr. 9:12-15, ECF No. 91-5 at 12417) The numbers of associates have increased in vehicle quality in 2017. (Arthur Dep. Tr. 10:1-8, ECF No. 91-5 at 12418) Since his involvement in vehicle quality the jobs involve visually looking at vehicles, driving on a test track, touching the vehicle, are some of the examples. (Arthur Dep. Tr. 12:21-25, ECF No. 91-5 at 12420; Arthur Dep. Tr. 13:1-21, ECF No. 91-5 at 12421) Vehicle quality does not require a driver's license or a commercial driver's license. (Arthur Dep. Tr. 13:1-7, ECF No. 91-5 at 12421) Exhibit 2 to his deposition is Bate 4504-5789 (ECF No. 92-1, 92-2, 92-3, 92-4, 92-5, 92-6). (Arthur Dep. Tr. 14:16-22, ECF No. 91-5 at 12422)

The operation standards in Exhibit 2 (to his deposition) occur after the vehicle has been assembled. (Arthur Dep. Tr.18:1-3, EFC No. 91-5 at 12426) Vehicle quality ensures quality for the customer prior to shipping. (Arthur Dep. Tr. 18:8-9, ECF No. 91-5 at 12426) Mr. Arthur explains what occurs in VQ. The exterior and interior are inspected prior to driving. The vehicle is driven, washed, checked for water leaks and overall general inspection to make sure nothing is damaged. (Arthur Dep. Tr. 18:10-25, ECF No. 91-5 at 12426; Arthur Dep. Tr. 19:1-17, ECF No. 91-5 at 12427) The process he describes has been substantially similar in VQ since 2010. (Arthur Dep. Tr. 19:18-21, ECF No. 91-5 at 12427) The operation standards in Exhibit 2 are part of an overall process that he testified to. (Arthur Dep. Tr. 20:2-5, ECF No 91-5 at 12428) Mr. Arthur does not know if operation standards exclude the use of left hands or right hands or whether they state any weight limitations relative to the standards. (Arthur Dep. Tr. 21:16-23,

ECF No. 91-5 at 12429; Arthur Dep. Tr. 22:6-9, ECF No. 91-5 at 12430)

Exhibit 19 (ECF 91-2 at 12314- 12315) is Def-045 and Def-048 labeled Process/Equipment Services Associate. (Tate-Brown Dep. Tr.159:16-25, ECF No. 91-2 at 12285; Tate-Brown Dep. Tr. 160:1-25, ECF No. 91-2 at 12286) This was an updated version. (Tate-Brown Dep. Tr. 161:5-8, ECF No. 91-2 at 12287) She does not know the exact date it was updated. Ms. Brown does not have an approximation of when the document was updated. (Tate-Brown Dep. Tr. 161:17-21, ECF No. 91-2 at 12287) The previous document mentioned 400 cars per day. (Tate-Brown Dep. Tr. 163:2-6, ECF No. 91-2 at 12289)

Defendant relies upon Exhibit 2 (ECF No. 76-4 at 641) to Ms. Brown's (Tate) declaration as the determinative factor of essential functions of employment positions relative to Ms. Beck. Exhibit 2 (ECF No. 76-4 at 641), or a similar document, was not provided to Ms. Beck, Ms. Cook, or Ms. Thomas, before or during their employments. (ECF No. 91-10 at 12630-12631, ¶30-33; ECF No. 91-12 at 12642, ¶12-13; ECF No. 91-11 at 12638, ¶42-43) Accordingly, Exhibit 2 (ECF No. 76-4 at 641) cannot be considered a written job description prepared before advertising or interviewing Ms. Beck before commencement of her employment with Defendant. 29 C.F.R. §1630.2(n)(1)(ii).

Exhibit 2 (ECF No. 76-4 at 641) to Brown's declaration is in reality a qualification standard rather than essential job functions at Defendant's facility. Defendant has ignored the actual essential job functions of its operation standards to conflate a qualification standard as essential functions of jobs performed.

"'Essential functions' are not to be confused with 'qualification standards,' which an employer may establish for a certain position. Whereas "essential functions" are basic "duties," 29 C.F.R. § 1630.2(n)(1), 'qualification standards' are 'personal and professional attributes' that may include 'physical, medical [and] safety' requirements. *Id.* § 1630.2(q). The difference is crucial." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007).

"The statute does not require that a person meet each of an employer's established 'qualification standards,' however, to show that he is 'qualified.' And, indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that forms the very basis of his discrimination challenge." *Id.*

The ADA explains when determining whether a job requirement is an "essential function," "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). However, such evidence is not conclusive; "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001).

A genuine issue of material fact exists regarding operation standards (i.e. job tasks) of employment positions at Defendant's facility versus Exhibit 2 (ECF No. 76-4 at 641) of Brown's declaration. For purposes of argument, even

assuming that Exhibit 2 (ECF No. 76-4 at 641) of Ms. Brown's declaration could be considered some essential functions of employment positions at Defendant's facility, the 7th Circuit has made it clear courts should not merely rubber stamp an employer's judgment about, which functions are essential. *Nicholas, supra,* *9. The 7th Circuit requires courts to also look in evidence of an employer's actual practices in the workplace. *Shell, supra,* 718. Also, the 7th Circuit has noted where an employer uses the words "may" or "occasional," can draw reasonable inferences that a reasonable jury to discount an employer's reliance on a job description. *Shell, supra*, 718, FN1. Exhibit 2 (ECF No. 76-4 at 641) to Ms. Brown's (Tate) declaration maintains "associates may perform…," "may work…," or that an associate is guaranteed to perform any or all of the above for any specific time or duration. Accordingly, the wording alone from Exhibit 2 (ECF No. 76-4 at 641) certainly casts doubt on Defendant's position that Exhibit 2 (ECF No. 76-4 at 641) are conclusively, as a matter of law, essential functions of employment positions at its facility.

The operation standards produced in discovery by Defendant only require visual, touch, and audible job tasks. (ECF No. 91-10 at 12632, ¶42-45; ECF No. 93-1, 93-2, 93-3, 93-4, 93-5, 93-6, 93-7, 93-8; 94-1, 94-2, 94-3, 94-4, 94-5, 94-6, 94-7, 94-8, 94-9, 94-10, 94-11, 94-12, 94-13; 95-1, 95-2, 95-3, 95-4, 95-5, 95-6, 95-7, 95-8, 95-9, 95-10, 95-11, 96-1, 96-2, 96-3, 96-4, 96-5, 96-6, 96-7, 96-8, 96-9, 96-10, 96-11, 96-12, 96-13, 96-14, 97-1, 97-2, 97-3, 97-4, 97-5, 97-6, 97-7, 97-8, 97-9, 97-10, 97- 11, 97-12; 92-1, 92-2, 92-3, 92-4, 92-5, 92-6) None of the operation standards identified pushing/pulling carts, operating

machinery such as forklifts, overhead cranes, lifting and carrying parts, max 40 pounds, or a CDL to test drive vehicles. Further, none of the declarants (Beck, Thomas, Cook) stated in their years of experience at Defendant's facility were they provided the document labeled "Process/Equipment Services Associate." Accordingly, there is a question of fact whether the functions relied upon by Defendant in Exhibit 2 to Ms. Brown's declaration would only be marginal and not essential. *Shell, supra*, 717.

C.    Genuine Issue of Material Fact Exists Regarding Defendant's Failure to Reasonably Accommodate Ms. Beck's Disability in May 2016

On May 19, 2016, Ms. Beck was performing quality checks for Defendant. She had been doing so since October 2014. In fact, she had worked regular and overtime hours from October 2014 to May 2016. (ECF No. 91-10 at 12629, ¶18) Defendant incorrectly maintains throughout its brief Ms. Beck was only interested in "light duty positions." Ms. Beck was interested in *any position* for which she had skill that would accommodate her disability. (ECF No. 91-10 at 12626-12633, ¶1-48; ECF No. 91-13 at 12644-12655)

Through discovery, it has been determined there were numerous jobs within doorline, vehicle quality or quality check for which would have accommodated Ms. Beck's disability. The term "reasonable accommodation" may include job restructuring or reassignment to a vacant position. 42 U.S.C.A. §12111(B).

The 7th Circuit has determined the ADA requires employers to appoint disabled employees to vacant positions, provided that such accommodations would not create an undue hardship (or run afoul of a collective bargaining

agreement). *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 764–65 (7th Cir. 2012). There is no collective bargaining agreement at Honda. Further, there is no undue hardship to place Ms. Beck in a position within doorline, vehicle quality or quality gates.

Plaintiff identified approximately 31 positions within vehicle quality where associates were terminated between July 2013 through November 2017 from Ms. Topper's deposition exhibits 2-7. (ECF No 91-14) Ms. Beck could have been placed within one of these positions given she was qualified to perform the essential job functions in vehicle quality. Examples of those positions have been outlined in Exhibit 14 (ECF No. 91-14) to Plaintiff's Designation. Department number 5210 is vehicle quality. (Topper Dep. Tr. 108:10-13, ECF No. 91-9 at 12611; Topper Dep. Tr. 109:1-2, ECF No. 91-9 at 12612; ECF No. 98-1 at 23091-23093; ECF No. 98-1 at 23094- 23096, ECF No. 98-1 at 23097- 23099; ECF No. 98-1 at 23100-23102; ECF No. 98-1 at 23103- 23105; ECF No. 98-1 at 23106-23108; ECF No. 98-1 at 23109-23133).

Ms. Topper merely ran a query for specific dates and terminated associates. It was completed for Exhibits to her deposition. (Topper Dep. Tr. 33:6-18, ECF No. 91-8 at 12552) PeopleSoft could be used to determine the number of associates hired and fired in quality gates within assembly frame from the time period of April 2010 to September 2017. (Topper Dep. Tr. 34:9-21, ECF No. 91-8 at 12553) PeopleSoft allows an inquiry from teams within a department. (Topper Dep. Tr. 93:19-25, ECF No. 91-9 at 12596; Topper Dep. Tr. 94:1, 11-21, ECF No. 91-9 at 12597) Exhibit 2 to Ms. Topper's deposition is Bate 13651 to 13672. (Topper Dep.

Tr. 82:23-25, ECF No. 91-9 at 12585; Topper Dep. Tr. 83:1, ECF No. 91-9 at 12586) This information came from PeopleSoft. (Topper Dep. Tr. 83:16-18, ECF No. 91-9 at 12586) Department ID of 4510 is considered assembly frame. Numbers 4550, 4552, 4555, are associated with doorline. (Topper Dep. Tr. 67:16-25, ECF No. 91-9 at 12570) On Bate 13641, Numbers 4557 is also doorline. (Topper Dep. Tr. 69:1-3, ECF No. 91-9 at 12572) Doorlines are within assembly frame. (Topper Dep. Tr. 69:9-16, ECF No. 91-9 at 12572) Those designations would be the same throughout 2 and 2A (ECF No. 99-1 at 23149-23192). (Topper Dep. Tr. 84:1-24, ECF No. 91-9 at 12587) Exhibit 2A has Bate 13673-13694. (Topper Dep. Tr. 88:6-8, ECF No. 91-9 at 12591) Exhibit 2A is the start date and termination reasons for associates identified in Exhibit 2 from July 2013 through November 2017. (Topper Dep. Tr. 88:9-16, ECF No. 91-9 at 12591)

PA would be the title for production associate under column "job code." (Topper Dep. Tr. 70:8-12, ECF No. 91-9 at 12573) Under the column "team," the acronym of ITRM means associates who are terminated. (Topper Dep. Tr. 24:18-24, ECF No. 91-8 at 12543)

In examining Exhibit 2 in relation to 2A identified above, one can quickly determine associates hired and terminated within doorline ID 4550, 4552, 4555, 4557 and their termination dates. By way of example, associate 34401 (ECF No. 99-1 at 23163) was terminated on May 17, 2016. This doorline position would have been available for Ms. Beck. There are several additional examples within Exhibits 2 and 2A, but the point remains, there are genuine issues of material fact regarding Defendant's failure to reasonably accommodate Ms. Beck into a

position rather than instructing her not to return to work in May 2016.

Combine the above with 6,110 temporary associates terminated from January 2011 to the present. (Topper Dep. Tr. 117:14-25, ECF No. 91- 9 at 12620; Topper Dep. Tr. 118:1-3, ECF No. 91-9 at 12621) There is an overwhelming genuine issue of material fact regarding Defendant's failure to accommodate Ms. Beck in May 2016.

From 2010 to 2016, associates with permanent restrictions could be placed in a quality gate position in assembly frame to accommodate restrictions. (Parker Dep. Tr. 60:17-23, ECF No. 76-3 at 626) Mr. Parker does not remember if he considered placing Ms. Beck in a quality gate position within assembly frame. (Parker Dep. Tr. 61:19-22, ECF No. 76-3 at 627) He does not remember any specific discussions or documentation whether that option was considered for Ms. Beck. (Parker Dep. Tr. 61:25, ECF No. 76-3 at 627; Parker Dep. Tr. 62:1-10, ECF No. 76-3 at 628)

Ms. Brown testified there would have been a listing of job functions for vehicle quality which would be considered essential job functions. However, she did not review those with Ms. Beck as it was not part of her process to do so. (Tate Brown Dep. Tr. 113:22-25, ECF No. 91-2 at 12261; Tate Brown Dep. Tr. 114:1-4, ECF No. 91-2 at 12262)

Further, Ms. Brown did not review information from PeopleSoft to determine if Ms. Beck could be reasonably accommodated within the Honda plant as of May 2016. (Tate-Brown Dep. Tr. 136:25, ECF No. 91-2 at 12276; Tate-Brown Dep. Tr. 137:1-4, ECF No. 91-2 at 12277) PeopleSoft is a personnel management program

used at the Greensburg plant since it has opened. (Topper Dep. Tr. 94:22-25, ECF No. 91-9 at 12597) It keeps track of personnel hired, fired, associates moving from one position to another, temporary associates and associates that move from one team to another. (Topper Dep. Tr. 95:2-21, ECF No. 91-9 at 12598)

Ms. Beck disputes Defendant's assertion that it accommodated her with medical leave. (ECF 78:10, 11, 13) In reality, Defendant forced Ms. Beck into leave. When Ms. Brown met with Ms. Beck in May 2016, Ms. Beck maintained she was able to perform work at Honda. As Ms. Brown testified "She has always indicated she is able to do work at Honda." (Brown-Tate Dep. Tr. 97:16-21, ECF No. 76-2 at 555)

Exhibit 10 to her deposition is the associate handbook. (Tate-Brown Dep. Tr. 70:22-25, ECF No. 91-2 at 12245; ECF No. 76-1 at 441-519) In May 2016, it was Ms. Brown who suggested Ms. Beck take a leave of absence. (Tate-Brown Dep. Tr. 71:23-25, ECF No. 91-2 at 12246; Tate-Brown Dep. Tr. 72:1, ECF No. 91-2 at 12247) The leave of absence suggested by Ms. Brown for Ms. Beck was not for military leave or not for personal leave. (Tate-Brown Dep. Tr. 73:11-17, ECF No. 91-2 at 12248) Ms. Brown agreed medical leave (non-occupational) (ECF No. 76-1 at 488) would mean it would not be work related. Ms. Brown agreed Ms. Beck was injured her shoulder in the course of her employment with Honda in June 2013. (Tate-Brown Dep. Tr. 75:2-9, ECF No. 91-2 at 12250)

D.    Genuine issue of material fact exists regarding that Ms. Beck suffered adverse employment action because of her disability relating to February 2014 restrictions.

During the meeting in May 2016, Ms. Brown told Ms. Beck Honda would no

longer accommodate her restrictions, as there were no jobs for her at that time. (Beck Dep. Tr. 197:1-6, ECF No. 76-1 at 444; Beck Dep. Tr. 198:1-2, ECF No. 91-1 at 12205) Designated evidence illustrates Honda only wanted associates to work without permanent restrictions.

Ms. Beck inquired why she could not be placed on one of the quality gates. Ms. Brown responded "We do not want people with permanent restrictions placed in those jobs because it sends out a bad message to the plant." (Beck Dep. Tr. 125:18-20, ECF No. 76-1 at 383) Ms. Brown's position is similar, if not identical to Exhibit 5 to Brandon Parker's deposition, email traffic between himself and Mr. Clark. (Parker Dep. Tr. 70:17-25, ECF No. 91-4 at 12372; ECF No 91-4 at 1204-12405) "I don't want associates with permanent restrictions thinking they get easy jobs if they go out and get documentation." The email mentions Ms. Beck and another associate having permanent restrictions. (Parker Dep. Tr. 72:19-22, ECF No. 91- 4 at 12374; ECF No 91-4 at 1204- 12405) At the time he wrote the email, he was team manager of the safety group. (Parker Dep. Tr. 74:4-7, ECF No. 91-4 at 12376)

Ms. Thomas, a former Honda associate, was told twice by Ms. Brown to have her restrictions removed so she could return to work at Honda. (ECF No. 91-11 at 12635-12368; ¶1-41) For Defendant to maintain Ms. Beck "...cannot identify any similar situated non-disabled employee treated more favorably" is incorrect. (ECF 78:20) Ms. Thomas was told by Ms. Brown to have her restrictions lifted so she could return to work at Honda. (ECF No. 91-11 at 12637, ¶24-29)

Honda would single out and monitor associates with restrictions. Mr. Parker

left assembly frame in April 2016. (Parker Dep. Tr. 83:23-25, ECF No. 91-4 at 12385) Prior to leaving assembly, if an associate was on leave or restriction, Mr. Parker would approve their time. (Parker Dep. Tr. 83:20-22, ECF No. 91-4 at 12385) Honda has a manpower tracking system to inform them how many associates are on the plant site. (Parker Dep. Tr. 84:4-9, ECF No. 91-4 at 12386) He would approve time for associates who had permanent restrictions. (Parker Dep. Tr. 84:10-12, ECF No. 91-4 at 12386) There was a separate time entry screen for associates on leave and restrictions. (Parker Dep. Tr. 84:18-25, ECF No. 91-4 at 12386; Parker Dep. Tr. 85:1-2, ECF No. 91-4 at 12387) A restricted associate is a person who could not perform the process with restrictions. (Parker Dep. Tr. 85:15-18, ECF No. 91-4 at 12387) This only applied to leave and restricted associates in assembly. (Parker Dep. Tr. 86:7-9, ECF No. 91-4 at 12388) There were two screens. A floor screen would be for associates who were not on leave and do not have restrictions unless the restrictions could be accommodated. (Parker Dep. Tr. 87:4-14, ECF No. 91-4 at 12386) The other screens were for associates on leave and had restrictions. (Parker Dep. Tr. 88:23-25, ECF No. 91-4 at 12390; Parker Dep. Tr. 89:1-2, ECF No. 91-4 at 12391) Exhibit 8[7] (ECF No. 91-2 at 12312-12313) to Mr. Parker's deposition is a payroll document I4590. It is chronological information related to Ms. Beck's employment (Tate-Brown Dep. Tr. 133:23-25, ECF No. 91-2 at 12273; Tate-Brown Dep. Tr. 134:6-8, ECF No. 91-2 at 12274) I is Indiana plant, 45 is assembly department, 90 is assembly department overhead. (Parker Dep. Tr. 89:22-25, ECF No. 91-4 at 12391; Parker Dep. Tr.

---

[77] See Exhibit 15 to Ms. Brown's deposition, as it is the same document. (ECF No. 91-2 at 12312-12313)

90:1-25, ECF No. 91-4 at 12392; Parker Dep. Tr. 91:1-20, ECF No. 91-4 at 12393; (ECF No. 91-2 at 12312-12313) AFOH means assembly frame overhead. (Ex. 4, 91:2-8) This is how Indiana associates would be classified in leave and restrictive screens as assembly frame "overhead." (Parker Dep. Tr. 91:4-12, ECF No. 91-4 at 12393)

The above evidence demonstrates genuine issues of material fact precluding summary judgment. ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment."). *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891 (7th Cir. 2001).

Accordingly, given the above, a genuine issue of material fact certainly exists that Ms. Beck was terminated because of her disability.

E.    <u>Genuine issue of material fact exists regarding mitigation of damages</u>.

Reasonable mitigation of damages is a question of fact for a jury. *Smith v. Rowe*, 761 F.2d 360, 366–67 (7th Cir. 1985), *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 439, 1992 WL 173234 (7th Cir. 1992).

Defendant's reliance upon *Hutton v. Sally Beauty Co.*, 2004 WL 2397606, at *3 (S.D. Ind. Oct. 22, 2004) is misplaced as it relates to this record. In *Hutton*, a Defendant must present undisputed evidence that substantially equivalent opportunities were available to a Plaintiff and a Plaintiff did not pursue those opportunities. *Id.* In *Hutton*, the Plaintiff did not dispute the evidence put forth. In this case, Ms. Beck testified she has looked for, but not found, jobs that have benefits, pay, hours, seniority, vacation as she did with Honda. (Beck Dep. Tr.

186:7-11, ECF No. 76-1 at 433). She has looked for factory positions in Columbus, North Vernon, Cummins, Faurecia, Lowe's Distribution. (Beck Dep. Tr. 186:12-18, ECF No. 76-1 at 433) Ms. Beck is currently employed as a server for Cracker Barrel located in Seymour. (ECF No. 91-10 at 12632, ¶48) Ms. Beck has been employed at Cracker Barrel since April 2019. (ECF No. 91-10 at 12632, ¶48) Ms. Beck also worked at Mark Pi's Restaurant in Columbus, Indiana beginning 2017. (Beck Dep. Tr. 18:8-10, ECF No. 76-1 at 305)

Defendant has not put forth evidence that there were substantially equivalent opportunities to Ms. Beck and that she did not pursue those opportunities.

## IV. The Court should strike certain parts of Mr. Parker's Declaration and not consider for purposes of summary judgment.

Plaintiff moves to strike the second and third sentences of paragraph 6 of Mr. Parker's declaration as there is no foundation. (ECF 76-6:3) Mr. Parker has no expertise to provide opinions regarding risk of injury or ergonomic opinions. When Mr. Parker testified about engineers at Honda, it is someone in a manufacturing capacity. It is not a traditional engineer in terms of degree. Mr. Parker agrees that a person would need to go to engineering school to be considered a safety engineer. (Ex. 4, 39:1-9) Mr. Parker does not know his training regarding Honda ergonomic guidelines relative to notification from the medical department of associates with restrictions for purposes of determining if said restrictions can be accommodated. He does not remember if he received training from Honda regarding the application of ergonomic guidelines for associates who had restrictions. (Parker Dep. Tr. 48:16-25, ECF No. 91-4 at 12360)

He does not recall if he has received any training relating to reasonable accommodation under the American with Disabilities Act through Honda or otherwise. (Parker Dep. Tr. 18:11-21, ECF No. 76-3 at 604)

As there is no foundation for said opinions, they should be stricken.

WHEREFORE, Plaintiff, by counsel, prays this Court DENY Defendant's motion and brief in support of summary judgment.

Respectfully Submitted,
/s/ J. Kevin King
J. Kevin King, #10849-03
Cline, King & King, P.C.
625 Reeves Way
Columbus, IN   47201
Voice: 812-372-8461
Fax: 812-372-2544
Email: mjn@lawdogs.org

## CERTIFICATE OF SERVICE

I hereby certify a true copy of the foregoing was served by e-filing notice, email, and/or first-class mail, postage prepaid, on Monday, August 05, 2019 upon:

Health L. Wilson
Frost Brown Todd LLC
201 North Illinois Street, Suite 1900
Indianapolis, IN 46244

Jennifer A. Rulon
Frost Brown Todd LLC
9277 Centre Pointe Drive, Suite 300
West Chester, OH 45069

/s/ J. Kevin King
J. Kevin King, #10849-03
